**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0084n.06

Case No. 16-4022

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Feb 20, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JAMES A. RUSSELL, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| JASON BUNTING, Warden, | ) | OHIO |
| | ) | |
| Respondent-Appellee. | ) | |

BEFORE: GUY, GIBBONS, and COOK, Circuit Judges.

COOK, Circuit Judge. Philip Troutwine and Candace Hargrove arranged to have sex at her apartment in September 2004. But Hargrove changed her mind; instead, she and her boyfriend James Russell decided they would rob Troutwine. After Troutwine arrived, Russell demanded money from him at gunpoint. From another room, Hargrove heard a struggle and a single gunshot—Russell had shot and killed Troutwine. Russell and Hargrove rolled up Troutwine's body in a tent, carried it downstairs, and stashed it in the trunk of Troutwine's car. The two lived on the lam until they were finally arrested in California. Russell was indicted on six counts, including aggravated robbery and felony murder.

It took two trials, a pair of *Batson* hearings, and multiple appeals in the Ohio courts for Russell's convictions on all six counts to be made final. He then filed a federal habeas petition that the district court dismissed in full. The district court granted a certificate of appealability to

consider one question, however, and this court expanded it to include a second: (1) whether the state courts reasonably rejected Russell's *Batson* claim, and (2) whether appellate counsel provided ineffective assistance by failing to reassert Russell's argument that his aggravated robbery and felony murder convictions should be merged for sentencing purposes. For the following reasons, we AFFIRM the district court's rejection of the *Batson* claim and REVERSE its decision that Russell procedurally defaulted his ineffective-assistance claim, which we REMAND to the district court for initial consideration of the merits.

## I. BACKGROUND

### A. First Trial and First Appeal

An Ohio jury found Russell guilty of felony murder, aggravated robbery, tampering with evidence, grand theft, and gross abuse of a corpse; a common pleas court judge convicted him of having weapons while under a disability. The court sentenced him to a prison term of 40 ½ years to life—of which 10 years were for aggravated robbery and 15 years to life were for felony murder, to be served consecutively. The Ohio Court of Appeals affirmed, *State v. Russell*, No. 21458, 2007 WL 93202, at *11 (Ohio Ct. App. Jan. 12, 2007), and the Ohio Supreme Court denied leave to appeal, *State v. Russell*, 867 N.E.2d 845 (Ohio 2007) (table).

For reasons not relevant here, the Ohio Court of Appeals later reopened Russell's appeal, reversed his convictions on the five counts tried to the jury, and remanded the case for a new trial. *State v. Russell*, No. 21458, 2008 WL 501594, at *13 (Ohio Ct. App. Feb. 22, 2008). The Ohio Supreme Court denied the State leave to appeal. *State v. Russell*, 891 N.E.2d 769 (Ohio 2008) (table).

**B.      Retrial and the Voir Dire Relevant to Russell's *Batson* Challenge**

The retrial jury pool included three African-Americans.  One was seated, another was stricken for cause, and the third—Tawana Pasqual—was peremptorily challenged by the State. *See State v. Russell (Russell II)*, No. 24443, 2012 WL 368135, at *1 (Ohio Ct. App. Feb. 3, 2012).  During voir dire, the prosecutor asked Pasqual about her employment:

> [PROSECUTOR]: And what type of courses did you take in college?
> [PASQUAL]: Managing and NC courses and (indiscernible) courses.
> [PROSECUTOR]: And do you have a particular occupation, ma'am?
> [PASQUAL]: I'm a licensing (indiscernible).
> [PROSECUTOR]: All right.  And how long have you been doing that now?
> [PASQUAL]: I just got licensed last year, so I haven't really been doing it quite yet.  But I got licensed last year.

The prosecutor did not ask Pasqual additional questions about her work history, but queried regarding her familial relationship with a law enforcement officer (Pasqual's "ex uncle was an officer") and a prior physical attack on her brother.[1]

Russell's counsel also asked several questions of Pasqual:

> [DEFENSE COUNSEL]: I am maybe making an assumption here.  I think you might be one of the younger jurors.  And even if you aren't, if everybody else feels one way but you feel strongly the other way, do you think you'd just give in to go with the other folks?  Or do you think you'd stand up for your belief and explain why you felt a certain way?
> [PASQUAL]: Probably stand up for myself and explain why I feel that way.
> [DEFENSE COUNSEL]: All right.
> [PASQUAL]: I'm not really easily persuaded.
> [DEFENSE COUNSEL]: At the same time, you -- you'd be -- would you remain open to understanding their point of view?
> [PASQUAL]: Yeah.  I'd remain open --
> [DEFENSE COUNSEL]: Okay.
> [PASQUAL]: -- to listening.

---

[1] Later proceedings clarify that Pasqual was licensed as a massage therapist.

> [DEFENSE COUNSEL]: And if they persuaded you, you'd be willing to change your mind?
> [PASQUAL]: Yes, if it's credible.
> [DEFENSE COUNSEL]: Okay.  Okay.  You'd have to hear them out and consider it?
> [PASQUAL]: Yes.
> [DEFENSE COUNSEL]: You'd be willing to consider it?  All right.  Even if it's 5:30 and you want to get home, willing to consider it?
> [PASQUAL]: Yes.

The State eventually exercised a peremptory strike against Pasqual.  Immediately thereafter, and without any prompting, the judge expressed doubt that there could be a *Batson* challenge because he discerned no "pattern" of excusing African-Americans given that Pasqual was the first one excused by the State for reasons other than cause.

After the new jury convicted Russell on all counts, the trial court imposed the same prison sentence.

## C.    Second Appeal

Russell appealed once again, advancing several assignments of error.  *See State v. Russell (Russell I)*, No. 23454, 2010 WL 3835645, at *1 (Ohio Ct. App. Oct. 1, 2010).  He claimed that the trial court improperly allowed the State to exercise a peremptory challenge to remove Pasqual from the jury and incorrectly failed to merge the aggravated robbery and felony murder convictions for sentencing purposes.  *See id.* at *2, *7.

The Ohio Court of Appeals held "that the trial court erred in its treatment of the *Batson* issue" by failing to "determine whether Russell had established a prima facie violation."  *Id.* at *3–4.  Explaining that the prosecutor "gave no reasons below for striking Pasqual because the trial court preempted the entire *Batson* issue," the court sustained Russell's assignment of error, reversed his convictions, and remanded the matter for a *Batson* hearing.  *Id.* at *4.

But the appellate court overruled Russell's merger argument. *See id.* at *7–12. Considering the elements of felony murder and aggravated robbery in the abstract as required by *State v. Rance*, 710 N.E.2d 699 (Ohio 1999), the court refused to merge the sentences because it determined that the two crimes were not allied offenses of similar import, as one did not require the commission of the other, *Russell I*, 2010 WL 3835645, at *9–10. The Ohio Supreme Court denied Russell leave to appeal. *State v. Russell*, 939 N.E.2d 1265 (Ohio 2011) (table).

## D.     First *Batson* Hearing

At the *Batson* hearing, Russell's counsel claimed that the peremptory challenge of Pasqual raised "a prima facie case [of discrimination] that the prosecutor now has to address." Counsel noted that one of the African-American venire members was excused for cause, leaving only two African-Americans—therefore, challenging Pasqual "effectively removed fifty percent of the . . . available African-Americans on the panel." The prosecutor did not dispute the numbers, instead arguing that striking an African-American juror is not enough, standing alone, to establish a prima facie case of racial discrimination.

The trial court agreed with the prosecutor and found that Russell had not demonstrated a prima facie indication of discrimination. Recognizing that appeals would likely follow, the court offered the prosecutor an opportunity to present a race-neutral explanation for excusing Pasqual but advised that it would not appraise the adequacy of the explanation. The prosecutor accepted the court's offer and expounded:

> In these types of cases, I prefer a juror who is older, more mature, seasoned, and has a stable work history, like employed or retired or maybe working and had been laid off. This particular juror had the appearance of being very young and did not have any work history. When asked, had got a job as a massage therapist the year before -- a massage license the year before. The trial was in April and May of the following year and had not worked.
>
> So, she was kind of on my radar screen as not fitting the type of juror I wanted.

However, it actual[ly] was the questioning of defense counsel, Ms. Haire, that led me actually to -- adding that to my prior thoughts which led me to the decision to ask for the preempt.

First of all, Ms. Haire in her first question, confirmed also her view that this juror was very young.

. . . . What concerned me was the colloquy between defense counsel and the juror that basically heightened the fact she was different from the other jurors as being younger. And then went into the questions of, what would happen if everyone else felt one way but you felt strong the other way, would you give in or stand up?

And the juror answered, I would stand up and explain my feelings.

What I term this type of questioning and always have, is it's like grooming a hold-out. What you do is find a difference between a juror and everyone else, highlight it, and then say, would you stand firm? So, in my mind it's like grooming a hold-out.

But what even disturbed me more was following that, without any question whatsoever, the juror, as if to -- to make even stronger her comment about, "I'd probably stand up for myself," was her comment, "I'm not really easily persuaded."

When that juror made that statement, "I am not easily persuaded," filed with no question asked and on the heels of, "I would stand up if it became me versus the other members of the jurors (sic)," that concerned me.

And those combination of reasons that we -- that I had mentioned, all together led me to my decision of wanting this juror removed.

Russell's counsel responded:

It's interesting that Mr. Daidone should first note that he had concerns about this juror's work history and the fact that she hadn't worked because Mr. Daidone asked other white jurors who either weren't working or had been working, additional questions about their work history. He asked this juror none.

And I should note that even though this juror looked young, according to her questionnaire, I believe -- and I was struggling here to -- to locate it, but it'll be in the record. She was 31 years old.

. . . .

Also, as to the grooming comment, I find it curious that the prosecutor's looking for mature individuals and yet doesn't want somebody who is mature enough to -- because if you read all of her questions and answers regarding her willingness to

stand up, she basically shows maturity of a 31-year-old or older in that she says, "I will listen; I will form an opinion. But I will listen to the others."

If you read it, the entire colloquy, it is clear that this juror was evincing a maturity to not fold, not cave, but simply require the State to put on -- or to meet their burden of proof. I'd also note that, again, prosecutors never followed up with any additional questions of her on this matter.

The prosecutor then reiterated that Pasqual's colloquy concerned him, particularly because the State had the burden of proof at trial.

In conclusion, the trial court repeated that it wouldn't decide whether the State articulated a race-neutral explanation for the strike because Russell had not made out a prima facie case of racial discrimination. It accordingly reentered Russell's convictions and sentence.

## E.     Third Appeal

Russell appealed—this time, through counsel—raising only a *Batson* issue. The Ohio Court of Appeals concluded that the trial court erred in finding that Russell had failed to establish a prima facie case of racial discrimination. *Russell II*, 2012 WL 368135, at *1, *6–9. The court additionally found "the reasons the prosecutor proffered to be race-neutral." *Id.* at *9. Because the trial court did not evaluate whether the prosecutor's race-neutral explanations were credible—the third and final step of the *Batson* analysis—the appellate court remanded for another hearing. *Id.* The Ohio Supreme Court denied the State leave to appeal. *State v. Russell*, 968 N.E.2d 492 (Ohio 2012) (table).

## F.     Russell's Motion to Reopen Third Appeal

Arguing ineffective assistance of appellate counsel, Russell sought to reopen his appeal in light of *State v. Johnson*, 942 N.E.2d 1061 (Ohio 2010), which changed the legal landscape in Ohio regarding merger of convictions for sentencing purposes. Overruling *Rance*, *Johnson* required consideration of whether "the same conduct constituted the commission of two offenses

of similar import under the facts" of the case instead of in the abstract. *Id.* at 1063–64. *Johnson* was decided in late December 2010, well before Russell's counsel filed the third appeal in August 2011. Thus, Russell claimed that his counsel provided ineffective assistance by failing to reassert the merger argument with respect to the felony murder and aggravated robbery convictions in light of the intervening change in law.

The Ohio Court of Appeals denied the motion. The merger argument was "barred by the law of this case," according to the court, because it had already been rejected in Russell's prior appeal. The court also reasoned that a renewal of the sentencing argument would have been outside the scope of the third appeal because the second appeal resulted in a remand only on the *Batson* issue. Russell did not seek leave to appeal in the Ohio Supreme Court.

## G.    Second *Batson* Hearing

At the second *Batson* hearing, the prosecutor requested that the court consider the retrial voir dire and initial *Batson* hearing records, and then reiterated his explanations for the peremptory challenge. He said that Pasqual

> had the appearance of being very, very young. . . . [Pasqual] had gotten a license
> to be a massage therapist a year before. This particular trial was in April or May
> of the following year and she had still not worked. So she kind of was on [his]
> radar screen because of her youthful appearance and again [he] wanted somebody
> usually more mature or seasoned.

He continued, noting that "it actually was the questioning of the Defense counsel . . . that led to [him] actually making a decision that [he] would use a peremptory challenge on this particular juror." Discussing his "grooming a holdout" explanation, the prosecutor stated that "the linchpin to [his] decision was [Pasqual] saying I'm not easily persuaded." In addition, he pressed the court to credit that (1) he "went in great detail about how prejudice plays no role in a criminal case" during voir dire, (2) several of the State's key witnesses were African-Americans, so "[i]t

would be simply ludicrous to remove African-Americans from the jury," and (3) one African-American was empaneled.

In response, Russell's counsel remarked that Pasqual was 31 years old, which "is not young," and that the prosecutor did not ask Pasqual about her work history. Counsel also emphasized that Pasqual, after stating that she was not easily persuaded, said that she would listen and remain open to changing her mind if she found the testimony credible.

The court "considered the entire record of the voir dire and impaneling transcript . . . . [i]ncluding the video recording," and listened to recordings of the prosecutor's explanations given at the initial *Batson* hearing. Based on the record and that morning's argument, the court found plausible and credible—and not pretextual—the State's explanation for striking Pasqual. The court then reentered Russell's convictions and sentence.

## H.    Fourth Appeal

The Ohio Court of Appeals affirmed. *State v. Russell (Russell III)*, No. 25467, 2013 WL 6174807, at *1 (Ohio Ct. App. Nov. 22, 2013). It did not find clearly erroneous "the trial court's conclusions that the prosecutor's statements were credible and not a pretext for discrimination." *Id.* at *6. With respect to questions about work history, the appellate court did "not find material differences in the prosecutor's questioning of [Pasqual]." *Id.* at *7. It also noted approvingly that the jury included an African-American member and that the prosecutor admonished prospective jurors not to consider race while hearing the case. *Id.* The Ohio Supreme Court denied Russell leave to appeal. *State v. Russell*, 6 N.E.3d 1204 (Ohio 2014) (table).

## I.    Federal Habeas Petition

With his convictions final in state court, Russell filed his federal habeas petition. Relevant to this appeal, Russell disputed the rejection of his *Batson* claim and alleged that he

received ineffective assistance of appellate counsel in connection with his third appeal. A magistrate judge recommended denying Russell's habeas petition. *Russell v. Bunting (Russell IV)*, No. 3:15-cv-331, 2016 WL 1170883, at \*13 (S.D. Ohio Mar. 25, 2016). He deemed the ineffective-assistance claim "too vague to adjudicate," *id.* at \*12, and discerned no pretext in the prosecutor's race-neutral explanations for peremptorily striking Pasqual, *id.* at \*7.

Russell objected to the report and recommendation, prompting the district court to return the petition to the magistrate for further analysis. Once again, the magistrate recommended denying the petition. *Russell v. Bunting (Russell V)*, No. 3:15-cv-331, 2016 WL 3194708, at \*10 (S.D. Ohio June 9, 2016). He reviewed more thoroughly the prosecutor's race-neutral explanations for peremptorily challenging Pasqual, but again held that the Ohio Court of Appeals's conclusion was not an unreasonable determination of the facts. *Id.* at \*1–3. The magistrate also grappled with Russell's claim of ineffective assistance of appellate counsel for failing to renew the merger-of-convictions sentencing argument in light of *Johnson*. *Id.* at \*7. Without considering the merits, he recommended denying the ineffective-assistance claim as procedurally "barred by the law of the case." *Id.* In conclusion, the magistrate recommended that the district court dismiss the habeas petition in full but grant Russell a certificate of appealability on the *Batson* issue. *Id.* at \*10. The district court adopted the supplemental report and recommendation, dismissing the petition and granting a certificate of appealability as to Russell's *Batson* claim. *Russell v. Marion Corr. Inst.*, No. 3:15-cv-331, 2016 WL 4440323, at \*1 (S.D. Ohio Aug. 23, 2016).

This court eventually granted Russell's application for an expanded certificate of appealability to include Russell's claim that his appellate counsel provided ineffective assistance

by failing to reassert the merger-of-convictions-at-sentencing argument in the third appeal. *Russell v. Bunting*, No. 16-4022 (6th Cir. May 30, 2017) (order).

## II. DISCUSSION

### A.    *Batson* Claim

"The Equal Protection Clause precludes a party from using a peremptory challenge to exclude members of the jury venire on account of their race." *Braxton v. Gansheimer*, 561 F.3d 453, 458 (6th Cir. 2009). Arguing that the state courts erroneously rejected his *Batson* claim that the peremptory strike of an African-American prospective juror evidenced discrimination, Russell seeks another retrial. A *Batson* challenge to a peremptory strike necessitates a three-step, burden-shifting inquiry:

> First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

*Rice v. Collins*, 546 U.S. 333, 338 (2006) (internal quotation marks and citations omitted). The parties do not dispute that the first two steps have been satisfied. To step three we go.

"[T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller-El v. Cockrell*, 537 U.S. 322, 338–39 (2003). We "can only grant [Russell's] petition if it was unreasonable to credit the prosecutor's race-neutral explanations for

the *Batson* challenge." *Rice*, 546 U.S. at 338. As the challenging party, Russell "bears the ultimate burden of persuasion" and "must show that the explanation is merely a pretext for a racial motivation." *Braxton*, 561 F.3d at 459.

### 1. Standard of Review

The parties agree—and so do we—that the Ohio Court of Appeals decided Russell's *Batson* claim on the merits. *See generally Russell III*, 2013 WL 6174807, at *1–8. That means we may grant Russell's petition only if the state court's rejection of this claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Russell concedes that the court's decision did not contravene or unreasonably apply clearly established federal law. 28 U.S.C. § 2254(d)(1). Instead, he alleges that the decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). "With respect to § 2254(d)(2), '[f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding.'" *Braxton*, 561 F.3d at 458 (quoting *Cockrell*, 537 U.S. at 340).

### 2. Race-Neutral Explanations

The prosecutor offered three race-neutral explanations for peremptorily striking Pasqual, and we conclude that it was reasonable to credit all three.

*Youthful Appearance.* One explanation the prosecutor gave for challenging Pasqual was that she "had the appearance of being very young." According to Russell, it is inconceivable that

"a prosecutor would regard a venire person's youthful appearance—as opposed to her actual age—as relevant to her desirability for jury service."

Although the prosecutor's "youthful appearance" explanation may be inartful, it is not incredible. For one, Russell offers no evidence that white jurors who appeared "very young" were nonetheless seated. Plus, as the State points out, Russell's counsel noted during voir dire Pasqual's youth relative to the other jurors, averring, "I think you might be one of the younger jurors. And even if you aren't, if everybody else feels one way but you feel strongly the other way, do you think you'd just give in to go with the other folks?" Just as Russell's counsel could be concerned that the older jurors would push Pasqual around in deliberations because she looked younger (or actually was younger) than them, so could the prosecutor. Russell has not demonstrated that this race-neutral explanation was pretextual.

*Work History.* Russell suggests that a comparative juror analysis undermines the credibility of the prosecutor's work-history explanation for the peremptory strike.[2] First, he claims the prosecutor allowed white jurors with similarly limited work histories to remain on the jury. He identifies Jurors Kitchen and Eller, neither of whom was employed when the retrial began, and Juror Tucker, who had worked in her position for only two months. He likewise contends that none of those three white jurors had a background of sustained employment. Second, Russell decries the prosecutor's asking several unemployed (or employed for only a short time) white jurors—but not Pasqual—about their prior work history. Juror Hobolt, for

---

[2] The State indicates that it is improper to conduct a comparative juror analysis. The district court granted a certificate of appealability on the *Batson* issue in light of *Foster v. Chatman*, in which the Supreme Court found a *Batson* violation upon thoroughly reviewing the state-court record for differences in treatment of jurors. 136 S. Ct. 1737, 1752, 1754, 1755 (2016). The State contends that *Foster* is inapplicable here given that it was decided several years after the last Ohio court adjudicated Russell's *Batson* claim. Yet, as Russell aptly observes, the Court conducted comparative juror analyses well before *Foster*. *See, e.g.*, *Snyder v. Louisiana*, 552 U.S. 472, 483–84 (2008).

example, was hired at a new restaurant only a week before trial, but additional questioning by the prosecutor revealed Hobolt's prior employment in construction.

Russell's arguments carry some water, as failing to ask follow-up questions can undercut the persuasiveness of the averred concern. *Miller-El v. Dretke*, 545 U.S. 231, 250 n.8 (2005); *see also United States v. Odeneal*, 517 F.3d 406, 421 (6th Cir. 2008) ("The failure of the prosecution to inquire regarding a reason purported to be a basis for a juror's dismissal serves as evidence of discrimination."). Yet, the context for the prosecutor's work-history explanation is important. "In these types of cases," he clarified, "I prefer a juror who is older, more mature, seasoned, and has a stable work history, like employed or retired or maybe working and had been laid off. [Pasqual] had the appearance of being very young and did not have any work history." Kitchen, Eller, and Tucker fit the prosecutor's stated preferences. Although Kitchen was not employed at the time of trial, voir dire identified that she was retired. In addition, Kitchen mentioned that she has grandchildren, which clearly implies that she was on the older side of the jury pool. Eller was a former teacher who retired to take care of her children; she described herself as "a full-time mom." Tucker, seated only as an alternate, explained that she did not have any spare time because she was a full-time mother.

Whereas Pasqual said she earned her license "last year" but still hadn't started working as of late April when the trial began, Hobolt stated that he had been hired at a new restaurant just the previous week. It thus seems only natural for the prosecutor to have asked Hobolt what he did prior to his week-old employment. Further undermining Russell's argument is the fact that the prosecutor not only left an African-American (Juror Harris) on the jury, but that he asked Harris about his work history. Therefore, it was not unreasonable for the state court to credit this race-neutral explanation.

*"Grooming a Holdout."* Russell offers multiple reasons why the prosecutor's "grooming a holdout" explanation is not credible, none of which moves us. First, Russell contends that the prosecutor could not have actually been concerned about Pasqual's declaration that she is "not really easily persuaded." He claims the prosecutor ignored Pasqual's affirmative responses to subsequent questions about "remain[ing] open to understanding" the other jurors' "point of view" and "be[ing] willing to change [her] mind." Yet Russell overlooks the prosecutor's good point that Pasqual said "I'm not really easily persuaded" without a question pending to her, thereby advertising her steadfastness without any prompting by counsel. True, Pasqual's colloquy with defense counsel continued beyond that statement. Even considering the colloquy in its entirety, however, it is not unbelievable that the prosecutor—representing the party with the burden of proof—still had concerns about Pasqual's ability to be persuaded. *Cf. Cockrell*, 537 U.S. at 339 ("Credibility can be measured by, among other factors, . . . whether the proffered rationale has some basis in accepted trial strategy.").

Second, Russell flags the prosecutor's failure to ask follow-up questions of Pasqual about her colloquy with defense counsel. But it's not as if the prosecutor asked follow-up questions of some jurors yet ignored Pasqual. Indeed, the prosecutor did not question any juror after defense counsel concluded her voir dire. And when defense counsel finished, the court did not offer the prosecutor an opportunity to ask additional questions before moving right into the defense's challenges for cause.

Third, Russell argues that the prosecutor's "grooming a holdout" justification *ipso facto* lacked credibility based on the "clearly pretextual" youthful-appearance and work-history explanations. As explained previously, however, neither of those explanations is fairly

characterized as "clearly pretextual." Simply put, Russell's arguments do not persuade us to distrust the prosecutor's "grooming a holdout" explanation.

3.    *Prosecutor's Credibility, Generally*

Russell presents several other reasons for questioning the prosecutor's credibility. He declares that Pasqual's relationship to a law enforcement officer and a brother who was a crime victim made her a favorable prosecution juror; thus, he alleges the prosecutor's explanation for striking her was further undermined. Russell additionally argues that the prosecutor could not bolster his credibility by cautioning the prospective jurors to ignore race.

With only a cold record before us, we defer to the trial court's evaluation of the prosecutor's credibility. *See Davis v. Ayala*, 135 S. Ct. 2187, 2201 (2015) ("A trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes."); *Cockrell*, 537 U.S. at 339 ("Deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire,* is not as well positioned as the trial court is to make credibility determinations."). Before making its credibility determination, the trial court reviewed the video recording of the voir dire, listened to the rationale given by the prosecutor at the first *Batson* hearing, and entertained counsels' arguments at the second *Batson* hearing. Not only did the trial court find credible the prosecutor's three race-neutral explanations for striking Pasqual, but it also deemed credible the prosecutor's argument that excusing an African-American juror based on her race "would defy logic in this case" because three of the State's key witnesses were African-American. The trial court likewise found credible the prosecutor's "comments to the general voir dire that justice is blind, [and] that race plays no part." Russell argues that this admonition

by the prosecutor doesn't bolster his credibility but actually implies that the prosecutor was considering race when he struck Pasqual; this is no more than an *ipse dixit*.

In sum, we do not find that the state court rejected Russell's *Batson* claim based on an unreasonable determination of the facts.[3]

## B.     Ineffective-Assistance Claim

Russell argues that his appellate counsel was ineffective for failing to re-argue in the third appeal that his felony murder and aggravated robbery convictions should be merged for sentencing purposes in light of *State v. Johnson*.  Before considering the merits of this claim, however, we must determine whether the district court properly determined that Russell procedurally defaulted it.

### 1.     Standard of Review

"We review de novo whether a petitioner's federal habeas claim is barred by procedural default."  *Middlebrooks v. Carpenter*, 843 F.3d 1127, 1134 (6th Cir. 2016) (internal quotation marks and citation omitted).

### 2.     Analysis

When it decided *Russell I* in October 2010, the Ohio Court of Appeals was bound by *State v. Rance*.  *Rance* held that allied offenses are of similar import—and, thus, subject to merger for sentencing purposes—if the elements of the offenses are so similar in the abstract that commission of one will result in the commission of the other.  710 N.E.2d at 703.  In late December 2010, the Ohio Supreme Court overruled *Rance* in *Johnson*, 942 N.E.2d at 1063, and

---

[3] Alternatively, Russell asks us to vacate the dismissal of his *Batson* claim and remand to the district court for consideration of the juror questionnaires that the magistrate declined to review while analyzing the habeas petition.  The magistrate explained that Russell did not identify anything in the questionnaires that wasn't already part of the record and would demonstrate the prosecutor's racial animus. *Russell IV*, 2016 WL 1170883, at *8.  We agree with the magistrate.

announced that courts must consider the accused's actual conduct in "determining whether two offenses are allied offenses of similar import subject to merger," *id.* at 1069.

Russell identified *Johnson* in his application to reopen his third appeal, but the Ohio Court of Appeals rejected the application without acknowledging the change in the law. Instead, the court determined that the law-of-the-case doctrine procedurally barred the merger argument because it had already been rejected in a prior appeal. The court also implied that it could not revisit the issue because the case was before the trial court on a limited remand dealing only with the *Batson* issue. The district court agreed. *Russell V*, 2016 WL 3194708, at *7. We, however, do not.

Because Russell did not violate a state procedural rule, we discern no procedural default that would bar his claim. *See Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000) ("For a habeas claim to be procedurally defaulted on the basis of a state procedural rule, the petitioner must have violated a procedural rule . . . ."). Ohio's law-of-the-case doctrine is inapplicable when "there has been an intervening change of law by a controlling authority," *State v. Apanovitch*, 64 N.E.3d 429, 438 (Ohio Ct. App. 2016) (citation omitted), as occurred when *Johnson* overruled *Rance*. Plus, because "an intervening decision by the [Ohio] Supreme Court" allows a lower court "to disregard the mandate of a superior court in a prior appeal in the same case," it did not matter that Russell's case was before the trial court on a limited remand when *Johnson* was decided. *Hopkins v. Dyer*, 820 N.E.2d 329, 331 (Ohio 2004) (quoting *Nolan v. Nolan*, 462 N.E.2d 410, 411 (Ohio 1984)).

The State's argument that Russell "default[ed]" his ineffective-assistance claim by failing to timely raise it in the fourth direct appeal is similarly unavailing. The key appeal here is the third—not the fourth—appeal. Russell's third appeal was his first post-*Johnson*; notwithstanding

the change in law, however, Russell's counsel failed to renew the sentencing argument at that stage. Nor are we persuaded by the State's assertion that Russell, proceeding pro se, failed to sufficiently plead this ineffective-assistance claim in his habeas petition.

We recognize that Russell did not appeal the denial of his motion to reopen the third appeal to the Ohio Supreme Court. Fortunately for Russell, the State forfeited this argument by failing to present it to the district court. *See Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006) ("[T]he failure to present an issue to the district court forfeits the right to have the argument addressed on appeal."); *see also, e.g.*, *Reeves v. Campbell*, 708 F. App'x 230, 241 (6th Cir. 2017). The State argued in its Return of Writ that Russell procedurally defaulted his ineffective-assistance claim because it was "simply impossible to ascertain from Russell's petition which of his counsel(s) he claims was ineffective and during which appeal(s)." But the State did not argue procedural default based on any failure by Russell to appeal to the Ohio Supreme Court the denial of his motion to reopen his third appeal. Rather, the State's Return of Writ merely mentions this failure in one lone sentence within a 13-page procedural history section. That isn't enough to bring the argument properly before us.

*3.      Remedy*

For the reasons just explained, we hold that the district court erroneously dismissed Russell's ineffective-assistance claim as procedurally barred. Russell would now have us address the claim's merits under *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny. We decline to do so. Because "no federal court has yet issued a substantive ruling on this habeas corpus claim," the proper remedy is a remand to the district court for a review of the merits. *Henderson v. Palmer*, 730 F.3d 554, 561 (6th Cir. 2013) (quoting *Smith v. Morgan*, 371 F. App'x 575, 582 (6th Cir. 2010)). Alas, the procedural history of this case will continue to swell. But

the district court should decide in the first instance whether Russell received ineffective assistance when his appellate counsel neglected to argue in the third appeal that the felony murder and aggravated robbery convictions should be merged for sentencing purposes in light of *Johnson*.

### III. CONCLUSION

Accordingly, we AFFIRM the district court's rejection of Russell's *Batson* claim and REVERSE its decision that Russell procedurally defaulted his claim that appellate counsel provided ineffective assistance by failing to reassert that the aggravated robbery and felony murder convictions should have been merged for sentencing purposes. We REMAND to the district court for initial consideration of the merits of this ineffective-assistance claim.